IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

FRESH VISION OP, INC., et al.,

                      **Plaintiffs**,

v.

MARK SKOGLUND, Executive Director,
Kansas Governmental Ethics Commission,
et al.,

                      **Defendants**.

Case No. 24-4055-DDC-TJJ

## MEMORANDUM AND ORDER AND SCHEDULING ORDER

Plaintiffs Fresh Vision OP, Inc., and its officers—James G. Muir (President) and Chengny Thao (Secretary and Treasurer)—have moved for a temporary restraining order and preliminary injunction. Doc. 2. Plaintiffs seek to enjoin defendants—members of the Kansas Governmental Ethics Commission—from enforcing against plaintiffs specified provisions of Kansas's Campaign Finance Act (Kan. Stat. Ann. §§ 25-4142–89) and accompanying regulations because they violate plaintiffs' First Amendment rights. Plaintiffs argue the specified provisions are unconstitutional on two theories: (1) Kansas's definition of "political committee" sweeps too broadly, thus violating Supreme Court precedent in *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam) and; (2) Kansas's $100 threshold for political-committee-like treatment contravenes Tenth Circuit precedent holding similar thresholds unconstitutional. Doc. 2 at 2. This Order decides the portion of motion seeking a TRO—it focuses solely on plaintiffs' first theory of unconstitutionality. The court defers decision on the preliminary injunction request, which relies

on plaintiffs' second theory.  After narrowing plaintiffs' requested relief, the court grants the TRO for reasons explained, below.

## I.  Background

Unless otherwise noted, the following facts are taken from plaintiffs' Complaint (Doc. 1).

### *Fresh Vision as an Organization*

Plaintiff Fresh Vision is a non-profit organization formed to improve the quality of life in Overland Park, Kansas.  Doc. 1 at 3 (Compl. ¶ 3).  Fresh Vision pursues this goal by advocating—through public activism and education—for wholesome neighborhoods, local small business growth, public safety, and responsible land development.  *Id.*  For example, Fresh Vision supports law enforcement and hazard pay for first responders.  *Id.* at 10 (Compl. ¶ 40).  And it opposes chip seal roads, Highway 69 tolls, prefabricated homes, high density luxury apartments, and tax giveaways.  *Id.* (Compl. ¶ 41).  It is a nonpartisan group with members who have diverse religious and political affiliations and diverse backgrounds.  *Id.* (Compl. ¶ 42); Doc. 2-1 at 1 (Muir Decl. ¶ 5).  Plaintiffs James G. Muir and Chengny Thao serve as Fresh Vision's officers.  Doc. 1 at 3–4 (Compl. ¶¶ 4–5).

### *Fresh Vision as a Political Committee*

In July 2021, Fresh Vision promoted a specific candidate (Dr. Faris Farassati) for mayor of Overland Park.  *Id.* at 11 (Compl. ¶ 44).  Fresh Vision endorsed Dr. Farassati on its website and through a mailer.  *Id.*  Shortly after these endorsements, on August 5, 2021, Fresh Vision received a letter from defendants—members of the Kansas Governmental Ethics Commission.  *Id.* at 4–5, 11 (Compl. ¶¶ 6–16, 45); Doc. 1-1 (Compl. Ex. 1).  The Commission enforces Kansas's Campaign Finance Act (Kan. Stat. Ann. §§ 25-4142–89).  Doc. 1 at 9 (Compl. ¶ 30).  The Commission's letter identified Fresh Vision as a political committee and required its registration in that capacity within 5 days.  *Id.* at 11 (Compl. ¶ 45); Doc. 1-1 (Compl. Ex. 1).

The letter—addressed to James G. Muir and Fresh Vision OP—threatened civil fines and criminal penalties for failure to comply with Kansas's campaign finance laws within 15 days. Doc. 1 at 11 (Compl. ¶ 45); Doc. 1-1 (Compl. Ex. 1).  And the Commission's letter identified intentional failure to file the required registration statement and fee as a class A misdemeanor, a crime punishable by imprisonment for a year.  Doc. 1 at 9 (Compl. ¶ 29); Doc. 1-1 (Compl. Ex. 1).  Fresh Vision and its officers suspended operations to avoid regulation as a political committee.  Doc. 1 at 12 (Compl. ¶ 50).  Plaintiffs opposed the Commission's regulation because they maintain they're not a political committee and because compliance is onerous and requires disclosure of donors—who, plaintiffs fear, will hesitate to donate under a disclosure regime.  *Id.* (Compl. ¶ 49).  Defendants then filed an official enforcement action to compel plaintiffs' compliance.  Doc. 2 at 3; Doc. 2-1 at 3 (Muir Decl. ¶ 11).

In March 2022, plaintiffs appeared pro se at an administrative hearing before the Commission in its enforcement action.  Doc. 1-2 at 2 (Compl. Ex. 2).  The hearing was held on the record and a video recording of the hearing is available at https://www.youtube.com/watch?v=4uXYXn4MCvE (last accessed July 15, 2024).  *Id.* at 3 (Compl. Ex. 2).  During the hearing, plaintiff Muir testified under oath that only 15% of Fresh Vision's money was spent on express advocacy.[1]  Doc. 15 at 13 n.4.  And plaintiff Thao testified

---

[1]     Defendants contest this testimony, asserting that "the facts suggested that [Fresh Vision] spent *the majority* of its money on express advocacy."  Doc. 15 at 13 n.4 (emphasis in original).  Defendants base this assertion on the officers' representation that Fresh Vision had "raised roughly $2000, but then spent that money on website development—which included support for the mayoral candidate—and money on mailers, one of which supported the candidate."  *Id.*  The court isn't necessarily convinced that defendants' calculations justify their conclusion.  Defendants have not explained what portion of the website development one properly should allocate to express advocacy—and why.  Provided that the website included content other than endorsement of Dr. Farassati, the entirety of the website development charge wouldn't seem to qualify as an express advocacy expense.  Nor have defendants approximated how much the express advocacy mailers cost versus other Fresh Vision mailers not expressly advocating for a candidate.  The court thus assumes, without deciding, that Fresh Vision didn't spend the majority of its money on express advocacy based on the representations of Fresh Vision's officers.

that less than 50% of Fresh Vision's activities were devoted to express advocacy given its 501(c)(4) status. *Id.*

After the hearing, plaintiffs retained counsel and moved for dismissal or rehearing based on defendants' allegedly committing several due process violations during the hearing. Doc. 1 at 11 (Compl. ¶ 46); Doc. 1-2 at 2 (Compl. Ex. 2). Among other things, plaintiffs alleged that defendants—through the Commission's Executive Director Mark Skoglund—presented unsworn testimonial evidence against them. Doc. 1 at 11 (Compl. ¶ 46); Doc. 1-2 (Compl. Ex. 2). Defendants then dismissed the charges. Doc. 1 at 11 (Compl. ¶ 47).

### *Fresh Vision in 2024*

Fresh Vision now wants to reengage in public advocacy and community education. *Id.* (Compl. ¶ 51). It wishes to take up issues like road surfacing, sewer concerns, highway tolls, first responder pay, residential development concentration, and expansion of a local arboretum into an event center. *Id.* (Compl. ¶¶ 51–52). Fresh Vision asserts that it aspires to raise community awareness on these issues by speaking at public events, distributing informational materials by direct mail, organizing the community, and utilizing its website. *Id.* at 12, 13 (Compl. ¶¶ 51, 53). It also intends to support Fresh Vision's goals by occasional express advocacy for public office candidates. *Id.* at 13 (Compl. ¶ 57). But Fresh Vision fears fines and jail time. *Id.* (Compl. ¶ 58). And so, it seeks the court's protection before reengaging. *Id.*

After considering the statutory scheme and the parties' arguments and submissions, the court grants a narrowed temporary restraining order under Fed. R. Civ. P. 65. It explains why, below.

## II.      Legal Standard

A party seeking a TRO must show: (1) that it is substantially likely to succeed on the merits; (2) that it will suffer irreparable injury if the court denies the requested relief; (3) that its

4

threatened injury without the restraining order outweighs the opposing party's injury under the restraining order; and (4) that the requested relief is not adverse to the public interest. *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019). The third and fourth factors "merge" when the government is the party opposing injunctive relief. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[I]n First Amendment cases, the likelihood of success on the merits will often be the determinative factor." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (internal quotation marks and citation omitted).

Preliminary relief—whether in the form of a TRO or a preliminary injunction—"is an extraordinary remedy, the exception rather than the rule." *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019) (preliminary injunction); *see also Heavy Petrol. Partners, LLC v. Atkins*, No. 6:09-cv-01077, 2010 WL 11565423, at *2 (D. Kan. May 25, 2010) ("A temporary restraining order is an extraordinary remedy that is an exception rather than the rule, and courts do not grant it as a matter of right."). The decision whether to issue "a temporary restraining order or other preliminary injunctive relief is within the sound discretion of the district court." *Sac & Fox Nation of Mo. v. LaFaver*, 905 F. Supp. 904, 906 (D. Kan. 1995).

## III.      Analysis

The court grants plaintiffs' request for a TRO because, it concludes, plaintiffs have established the three requisite prongs. The court begins by explaining why plaintiffs are likely to succeed on the merits, the factor which our Circuit has identified as "often determinative" in a First Amendment case like this one. *Hobby Lobby*, 723 F.3d at 1145. And then, the court explains why plaintiffs will suffer irreparable harm absent the requested relief. Finally, the court addresses together—and briefly—the balance of equities and public interest prongs before outlining the narrowed relief it provides to plaintiffs with this Order.

A.      **Likely to Succeed on the Merits**

To secure a TRO, a party must first establish that it is substantially likely to succeed on the merits. *Mrs. Fields Franchising*, 941 F.3d at 1232. Though plaintiffs needn't prove their likelihood of success beyond all doubt, they must show a reasonable probability of their eventual entitlement to relief on the merits. *Speight v. Gordon*, 582 F. Supp. 3d 897, 903 (D. Wyo. 2022) (citing *Cont'l Oil Co. v. Frontier Refining Co.*, 338 F.2d 780, 781 (10th Cir. 1964) (per curiam)). For purposes of this TRO, the likelihood of that success turns on whether plaintiffs' first theory of unconstitutionality holds water: Plaintiffs contend that Kansas's Campaign Finance Act allows the state to bestow political committee status on a group when express advocacy is only *a* major purpose of the group. *See* Kan. Stat. Ann. § 25-4143(*l*)(1). And that's a problem, plaintiffs argue, because Supreme Court precedent requires that a political committee includes only entities "*the* major purpose of which is the nomination or election of a candidate." *Buckley*, 424 U.S. at 79 (emphasis added).[2] Plaintiffs assert that the article "a"—as opposed to "the"—in Kansas's definition of the term "political committee" allows Kansas to designate an organization as a political committee when express advocacy is just *one of* its *multiple* major purposes. And that one-of-many-purposes approach directly contravenes *Buckley*, plaintiffs argue. Kansas law thus fails *Buckley*'s major purpose test, plaintiffs contend. Doc. 2 at 5. So, when Kansas imposes a disclosure regime on a group based on this one-of-many approach, plaintiffs assert, it violates that group's First Amendment speech and association rights. Before diving deeper into

---

[2]      *Buckley* also permits a political committee to include "organizations that are under the control of a candidate[.]" 424 U.S. at 79. But this variant of political committee isn't at issue here. Defendants don't assert that a candidate controlled Fresh Vision in the past. *See generally* Doc. 15. And plaintiffs affirmatively represent that "[n]o candidate for public office or a candidate's committee has ever or will ever control Fresh Vision." Doc. 2-1 at 5 (Muir Decl. ¶ 20); Doc. 2-2 at 5 (Thao Decl. ¶ 20). Defendants provide nothing to challenge plaintiffs' proposition.

plaintiffs' likelihood of success on these arguments, the court pauses and outlines the relevant statutory scheme.

### 1.    Kansas's Political Committee Statutes

Plaintiffs' motion asks the court, at the TRO stage, to enjoin defendants from enforcing Kan. Stat. Ann. §§ 25-4143(*l*)(1), 25-4145, and 25-4148 and Kan. Admin. Regs. § 19-21-3.  At the heart of plaintiffs' argument is the statutory definition of "political committee" supplied by Kan. Stat. Ann. § 24-4143(*l*)(1).  It reads:

> "Political committee" means any combination of two or more individuals or any person other than an individual, *a* major purpose of which is to expressly advocate the nomination, election or defeat of a clearly identified candidate for state or local office or make contributions to or expenditures for the nomination, election or defeat of a clearly identified candidate for state or local office.

Kan. Stat. Ann. § 25-4143(*l*)(1) (emphasis added).  The other statutes and the regulation at issue are operational in nature.  That is, they outline the duties and requirements that persons who meet the statute's definition of a political committee must follow.  They require, for example, that a political committee appoint a chairperson and treasurer, file a statement of organization, file a financial report, and file a report identifying each candidate who is the subject of an expenditure. Kan. Stat. Ann. §§ 25-4145, 25-4148; Kan. Admin. Regs. § 19-21-3.  Plaintiffs don't argue that the operational statutes and regulation are unconstitutional themselves.  Instead, plaintiffs seek to enjoin their enforcement because they impose requirements based on Kan. Stat. Ann. § 25-4143(*l*)(1)'s too broad definition of the term "political committee"—due to the indefinite article, "a."  In sum, the likelihood of success prong comes down to a simple battle of the articles—"a" major purpose versus "the" major purpose.

### 2.    Plaintiffs' Argument:  Fourth Circuit Case

Plaintiffs premise a significant portion of their brief on a Fourth Circuit case that addressed—and embraced—plaintiffs' precise "a-versus-the" argument.  *N. C. Right to Life, Inc.*

*v. Leake (NCRTL)*, 525 F.3d 274, 287–89 (4th Cir. 2008).  The Fourth Circuit determined that a North Carolina statute defining "political committee" using the indefinite article "a" was unconstitutionally overbroad.  *Id.* at 289.  It rested its decision on the definite article crafted by *Buckley*'s major purpose test.  *Id.*  The Fourth Circuit explained:

> [T]he entire aim of *Buckley*'s "*the* major purpose" test was to ensure that all entities subjected to the burdens of political committee designation were engaged primarily in regulable, election-related speech.  By diluting *Buckley*'s test and regulating entities that have the opposition or support of political candidates as merely "*a* major purpose," North Carolina runs the risk of burdening a substantial amount of constitutionally protected political speech.

*Id.* (emphasis in original).  The Fourth Circuit bolstered its decision by highlighting the difficulty of determining when any given purpose becomes *a* major purpose and how that difficulty could invite partisan or ideological abuse.  *Id.* at 290.

Plaintiffs assert that the Tenth Circuit—like the Fourth Circuit—has adopted *Buckley*'s major purpose test.  They reference two cases as support:  *New Mexico Youth Organized v. Herrera (NMYO)*, 611 F.3d 669 (10th Cir. 2010), and *Colorado Right to Life Committee, Inc. v. Coffman (CRLC)*, 498 F.3d 1137 (10th Cir. 2007).  Given that adoption, plaintiffs contend, the court should find Kansas's statute unconstitutionally broad, just as the Fourth Circuit held for North Carolina's law in *NCRTL*.

Defendants retort that the court should distinguish these Tenth Circuit cases because neither involved an organization who engaged in express advocacy—as plaintiffs here did.  Doc. 15 at 7.  And then defendants urge the court to follow the three other circuits who have rejected plaintiffs' "a-versus-the" argument—the First, Seventh, and Ninth.  *Id.* at 8.  These other circuit cases, defendants contend, are "far more compelling than the Fourth Circuit majority in" *NCRTL*. *Id.*

To resolve this dispute—and to determine the likelihood of plaintiffs' success on the merits—the court engages in a brief discussion of the relevant cases. In the end, though, the role of a district court is clear: it must apply circuit precedent. *See In re Lerner*, 611 B.R. 409, 415 (Bankr. D. Kan. 2019) ("Absent en banc reconsideration or an intervening Supreme Court decision, the Kansas district court is bound by the precedent set forth by the Tenth Circuit Court of Appeals." (quotation cleaned up)). This court reads the Tenth Circuit cases *NMYO* and *CRLC* to signal that *Buckley*'s major purpose test applies to a state's regulation of political committees. And that conclusion, alone, ends the dispute.

### 3.     Other Circuits' Cases:  First, Seventh, and Ninth

The First, Seventh, and Ninth Circuits have rejected requests to apply *Buckley*'s major purpose test to a state's regulation of political committees. *See Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 59 (1st Cir. 2011) (declining to apply *Buckley*'s "so-called 'major purpose' test" to Maine's non-major-purpose PAC definition because the test is simply "an artifact of the Court's construction of a federal statute"); *Hum. Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1009–10 (9th Cir. 2010) (rejecting "proposed bright-line prohibition on regulating groups with only 'a' primary purpose of political advocacy" because *Buckley*'s major-purpose statement "does not indicate that an entity must have that major purpose to be deemed constitutionally a political committee").

The Seventh Circuit's decision in *Center for Individual Freedom v. Madigan* best articulates this line of cases. 697 F.3d 464 (7th Cir. 2012). Plaintiff there brought a facial challenge against Illinois's disclosure requirements, in part, because they allowed regulation of groups who didn't have *the* singular major purpose of influencing electoral campaigns. *Id.* at 470. So, plaintiff argued, Illinois's definition of political committee was unconstitutionally vague and overbroad. *Id.* at 486–87. The Seventh Circuit held that the "major purpose"

limitation in *Buckley* "was a creature of statutory interpretation, not constitutional command" and thus not applicable to a state's regulation of political committees.  *Id.* at 487.  And the Seventh Circuit identified several reasons why *Buckley*'s major purpose limitation shouldn't apply to Illinois's disclosure requirements.  *Id.*  These reasons included:  it could yield "perverse" results by excusing registration of a "mega-group" that spends a large amount of money but just a small portion of its budget on express advocacy; and it could permit a group to circumvent disclosure requirements by merging with a non-campaign related organization or otherwise diluting its purpose.  *Id.* at 487–90.

Even if these major purpose test criticisms have logical appeal—as defendants suggest— it doesn't matter.  The Seventh Circuit—like the First and Ninth Circuits—premised its decision on rejecting the major purpose test to evaluate a state's regulation of political committees.  *Id.* at 491.  That is, *Buckley* concerned a federal—not a state—campaign finance statute (FECA) and thus doesn't apply in the state campaign finance context.  But the Tenth Circuit plainly has endorsed and applied the major purpose test to state statutes, as shown below.

### 4.    Tenth Circuit Cases:  *NMYO* and *CRLC*

The Tenth Circuit hasn't addressed plaintiffs' "a-versus-the" argument directly.  But, our Circuit has applied *Buckley*'s major purpose test to a state's regulation of political committees. In *NMYO*, two organizations—both formed to educate the public about political issues— challenged the New Mexico Secretary of State's attempts to enforce the New Mexico Campaign Reporting Act (NMCRA) against them as political committees.  611 F.3d at 675–77.  In deciding the propriety of classifying the two organizations as political committees, our Circuit applied *Buckley*'s major purpose test—and the Circuit quoted with approval the Fourth Circuit's *NCRTL* decision when it did so.  *Id.* at 677–78 ("To be regulated under the standards established by the Supreme Court, the [NMCRA's] language would need to satisfy the 'major purpose' test,

10

because this test sets the lower bounds for when regulation as a political committee is constitutionally permissible."). Our Circuit also reiterated "the Supreme Court's repeated admonition that only organizations that have 'the major purpose' of electing or defeating a candidate may be forced to register as political organizations." *Id.* at 679. The court interprets *NMYO* as signaling our Circuit's intent to apply *Buckley*'s major purpose test to state political committee regulation. And *NMYO* wasn't its first nod in that direction.

In *CRLC*, the Tenth Circuit evaluated a constitutional challenge to the Colorado Constitution's definition of a political committee. 498 F.3d at 1139. Colorado law defined political committee as "'any group of two or more persons . . . that have accepted or made contributions or expenditures in excess of $200 to support or oppose the nomination or election of one or more candidates.'" *Id.* at 1141 (quoting Colo. Const. art. XXVIII, § 2(12)(a)). The federal district court concluded that Colorado's political committee definition "was unconstitutional as applied to CRLC because it failed to include *Buckley*'s 'major purpose' test." *Id.* Our Circuit affirmed, quoting *Buckley*'s test and explaining the test's "unaltered" state in the wake of other Supreme Court opinions. *Id.* at 1152–53.

Our Circuit thus has applied the "major purpose" test to state political committee regulation in both New Mexico and Colorado. And in *NMYO*, our Circuit aligned itself with the Fourth Circuit's approach in *NCRTL*. To be sure, the organizations at issue in *NMYO* and *CRLC* hadn't engaged in express advocacy, as plaintiffs here have. And defendants ask the court to distinguish among these cases on that basis. But that's a distinction without a difference. Our Circuit applied *Buckley*'s test to evaluate whether a state appropriately had designated an organization as a political committee under state law. So, the court concludes, it must apply *Buckley*'s major purpose test when it engages in the very same evaluation here. And under that

test, Kansas's "political committee" definition likely is impermissibly broad due to the statute's use of the indefinite article, "a."

### 5.    As-Applied vs. Facial Unconstitutionality

The court must address one final question as it evaluates plaintiffs' likelihood of success on the merits—are plaintiffs likely to succeed on an as-applied or facial unconstitutionality basis?  At one point, plaintiffs' brief appears to mount a facial First Amendment challenge to Kansas's definition of a "political committee," arguing that Kan. Stat. Ann. § 25-4143(*l*)(1) "is facially unconstitutional because its text literally fails the major purpose test."  Doc. 2 at 7.  But that is plaintiffs' sole reference to facial unconstitutionality.[3]  *See generally id.* at 1–8.  And, at the TRO hearing, plaintiffs explicitly clarified that their current challenge is as-applied—at least at the TRO stage.  What's more, plaintiffs' requested relief also manifests an as-applied challenge:  they ask the court to enjoin enforcement specifically "against Plaintiffs."  *Id.* at 1.  This ambiguity leaves the court to decide whether plaintiffs' challenge is facial or as-applied.

"[C]lassifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated and the corresponding 'breadth of the remedy[.]'" *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019) (quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010)).  In *CRLC*, the Tenth Circuit declined to reach CRLC's facial challenge to Colorado's "political committee" definition because the district court already had granted a narrower remedy on an as-applied basis.  498 F.3d at 1144–45.  The Tenth Circuit explained its decision by referencing "the general proposition that a court should never formulate a rule of constitutional law broader than is required by the precise facts to which it is to be

---

[3]    Also, plaintiffs' brief twice references facial unconstitutionality in the context of the $100 independent expenditure threshold.  Doc. 2 at 10, 14.  But the independent expenditure statutes are not at issue at the TRO stage and so they don't factor in here.

applied." *Id.* at 1155–56 (quotation cleaned up).  And the Supreme Court recently reiterated that a lower court, when presented with a facial challenge, must "address the full range of activities the laws cover, and measure the constitutional against the unconstitutional applications" starting with the state laws' scope, then deciding which of the laws' applications violate the First Amendment and, finally, measuring these unconstitutional applications against the constitutional ones. *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397–98 (2024).

Here, plaintiffs sought to demonstrate the statute's invalidity by focusing specifically on enforcement against Fresh Vision.  And plaintiffs have requested a narrow, plaintiffs-only remedy.  Plaintiffs also didn't address—in their brief or during oral argument—the full range of activities the relevant statutes cover, or measure the constitutional applications against the unconstitutional ones.  The nature of plaintiffs' arguments, coupled with plaintiffs' requested remedy and their explicit as-applied classification during the TRO hearing, thus favor construing plaintiffs' challenge as an as-applied challenge.  And that approach proves consistent with the Tenth Circuit's counsel against broad rulings about constitutionality.

So, the court evaluates the likelihood of plaintiffs' success in the context of an as-applied challenge.  And the court concludes plaintiffs are likely to succeed in demonstrating that Kansas's definition of a political committee is invalid as applied to them because, under *Buckley*, the Kansas definition allows defendants to apply political committee requirements to Fresh Vision without first establishing that express advocacy is Fresh Vision's singular major purpose.[4] Plaintiffs thus carry the burden imposed by the first prong in the TRO standard.  The court moves on to the second, below.

**B.      Irreparable Harm**

---

[4]      The court directs the plaintiffs, in their future briefing, to outline clearly whether they bring a facial or as-applied challenge.

To merit a TRO, a party must also establish that it will suffer irreparable injury if the court denies the requested relief. *Mrs. Fields Franchising*, 941 F.3d at 1232. Plaintiffs here assert that the potential enforcement of Kansas's Campaign Finance laws against them has caused Fresh Vision to go "dormant out of fear of further government interference with its mission and persecution of Muir, Thao, and its members." Doc. 2 at 4. And now, plaintiffs contend, Fresh Vision hesitates to fundraise unless its donors can remain anonymous—a state of affairs that requires Fresh Vision to avoid designation as a political committee. *Id.* Plaintiffs thus premise their injury on the chilling effect Kansas's laws allegedly have imposed on their First Amendment rights of speech and association.

Under the Tenth Circuit standard, "a plaintiff satisfies the irreparable harm requirement by demonstrating 'a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.'" *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)). To justify interim relief, that harm mustn't be purely speculative and must be "'likely to occur before the district court rules on the merits.'" *Id.* (quoting *Greater Yellowstone Coal.*, 321 F.3d at 1260). "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Hobby Lobby*, 723 F.3d at 1145 (internal quotation marks and citation omitted).

In *CRLC*, discussed above, the Tenth Circuit evaluated CRLC's injury—in a footnote standing analysis. 498 F.3d at 1145 n.6. The Circuit determined that CRLC had "suffered the constitutionally sufficient injury of self-censorship through the chilling of protected First Amendment activity" and had suffered "when it [had to] either make significant changes to its operations to obey the regulation, or risk an investigation and citation." *Id.* Here plaintiffs

allege they have lost their First Amendment freedoms of speech and association during Fresh Vision's three-year (and ongoing) period of dormancy.  And plaintiffs contend that they have suffered self-censorship.  Defendants threatened to enforce political committee reporting requirements—or attendant penalties of a fine or imprisonment—on Fresh Vision.  Doc. 2 at 3.  These threats, plaintiffs assert, chilled protected First Amendment activity.  *See id.* at 4.  Tenth Circuit precedent dictates that Fresh Vision's alleged loss of First Amendment freedoms "unquestionably constitute[] irreparable injury."  *Hobby Lobby*, 723 F.3d at 1145 (internal quotation marks and citation omitted).  And so, the court concludes plaintiffs have established the irreparable injury prong required for a TRO.

Defendants, for their part, argue that plaintiffs cannot satisfy the irreparable injury prong of the TRO standard for two reasons.  *First*, defendants contend, plaintiffs aren't experiencing any current injury because Kansas law doesn't require Fresh Vision to register as a political committee until it expressly advocates for a candidate—which won't occur until the local election cycle starts in 2025.  Doc. 15 at 3–4.  So, defendants assert, a full year must pass before plaintiffs experience harm from political committee reporting requirements.  *Id.  Second*, defendants argue, plaintiffs' three-year delay after receiving the August 2021 letter and before filing suit undermines plaintiffs' showing of irreparable harm.  *Id.* at 4–5.  But defendants' arguments are unavailing and the court explains why, below.

## 1.    No current injury

Defendants first argue that plaintiffs won't experience an injury until they endorse a candidate, the first opportunity for which is the local election in 2025.  And so, defendants contend, plaintiffs don't satisfy the irreparable injury prong.  But defendants' argument mischaracterizes plaintiffs' injury by recharacterizing it.  Plaintiffs' claim of injury doesn't arise only with a political committee designation in 2025.  Instead, plaintiffs assert a current (and

15

ongoing) injury consisting of chilling their freedom of speech in the form of self-censorship and chilling their freedom of association in the form of hesitating to fundraise.  And, as plaintiffs pointed out at the TRO hearing, waiting to request relief until closer to the local election—under defendants' theory that no injury inheres until that time—is inadvisable.  Indeed, judicial restraint becomes progressively more important as an election nears.  *See Democratic Nat'l Comm. v. Wis. State Legis.*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring) ("That important principle of judicial restraint . . . discourages last-minute litigation and instead encourages litigants to bring any substantial challenges to election rules ahead of time[.] . . . [A] federal court's last-minute interference with state election laws is ordinarily inappropriate.").

Defendants' other argument trying to undermine plaintiffs' irreparable injury—delay—similarly falls flat.

## 2.     Delay and Irreparable Injury

Defendants next argue that plaintiffs' three-year delay before filing suit undermines a showing of irreparable harm.  To be sure, a party's "delay in seeking preliminary relief cuts against finding irreparable injury." *RoDa Drilling*, 552 F.3d at 1211 (citation and internal quotation marks omitted).  But delay is just "one factor in the irreparable harm analysis[.]" *Id.* And so, a delay, in the end, may "not alter the outcome of the proceedings." *Id.*; *see also Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Social & Rehab. Servs.*, 31 F.3d 1536, 1543–44 (10th Cir. 1994) (overlooking three-month delay when conducting irreparable harm analysis because the delay stemmed from plaintiffs' attempts to negotiate and to document harm).  In *RoDa Drilling*, the Tenth Circuit chose to overlook RoDa's two-year delay because "the record clearly establishe[d] that [RoDa's delay] arose from its attempts to resolve the dispute, rather than a decision merely to 'sit on its rights.'" *Id.* at 1212.  RoDa's attempts included hiring a consultant to investigate and initiating meetings to resolve the dispute.  *Id.*  The Tenth Circuit also noted

16

that the opposing party never argued that RoDa's delay disadvantaged the opposing party's interests. *Id.*

Here, plaintiffs' delay stretched from August 5, 2021, until they filed this motion in late June 2024—about three years. Plaintiffs clarified during the TRO hearing that they waited to file this action because they had hoped to resolve these issues through statutory changes made by the Kansas Legislature. Plaintiffs explained that they engaged with the Kansas Legislature, who made procedural changes to the relevant statutes in the 2023 legislative session and considered substantive changes in the 2024 legislative session. But in the end, the work to make substantive amendments was to no avail. After the substantive changes fell through, plaintiffs filed this action in June 2024. Our Circuit's precedent indicates that a court may overlook delay when it's attributable to attempts to resolve the dispute. *Id.* And here, the court concludes plaintiffs' pursuit of legislative solutions qualifies as an effort to resolve the very dispute addressed in this Order. What's more, defendants never identified any disadvantage to their interests from plaintiffs' delay. Plaintiffs' delay here thus doesn't "cut[] against finding irreparable injury." *Id.* at 1211 (citation and internal quotation marks omitted). Having concluded plaintiffs satisfy the first two prongs of the TRO standard, the court completes the analysis with the final two prongs merged together.

### C.    Balance of Equities and Public Interest

The final merged prong requires a party seeking a TRO to show that its threatened injury without the restraining order outweighs the opposing party's if the order issued; and that the requested relief is not adverse to the public interest. *Mrs. Fields Franchising*, 941 F.3d at 1232.

Neither party offers much argument on these two prongs, and with good reason. In the context of a First Amendment case like this one, where plaintiffs assert unconstitutionality, these

final two prongs are straightforward.  The Tenth Circuit has determined that "when a law is likely unconstitutional, the interests of those the government represents, such as voters, do not outweigh a plaintiff's interest in having its constitutional rights protected."  *Hobby Lobby*, 723 F.3d at 1145 (quotation cleaned up).  And the Tenth Circuit has concluded that "it is always in the public interest to prevent the violation of a party's constitutional rights."  *Id*. (internal quotation marks and citation omitted).  In this context, then, the balance of the equities tips to favor protecting plaintiffs' constitutional rights.  And it is in the public interest to ensure Kansas's laws don't violate those rights.  Plaintiffs thus satisfy the final two prongs of the TRO standard.  With all three prongs satisfied, the court will grant plaintiffs relief.

## IV.      Requested Relief

The court cannot, however, grant the full measure of relief that plaintiffs' motion requests.  Plaintiffs' motion asks the court for "a temporary restraining order . . . prohibiting Defendants from enforcing K.S.A. §§ 25-4143(*l*)(1), 25-4145, and 25-4148 and K.A.R. § 19-21-3 against Plaintiffs."  Doc. 2 at 1.  But whether plaintiffs will qualify as a political committee—based on future conduct—is outside the court's control.  And so, it's improper for the court to enjoin all possible enforcement of these provisions against plaintiffs.  For example, after this Order issues plaintiffs could advocate expressly to such an extent that the state properly—here, meaning constitutionally—could determine that such advocacy is plaintiffs' singular major purpose.  In such a situation—one where the state designates plaintiffs as a political committee in a constitutionally appropriate manner—the court shouldn't interfere with Kansas's legitimate informational interest in requiring disclosure and reporting.  Indeed, this Order doesn't determine whether Fresh Vision is—or ever was—a political committee.  So, the court cannot enjoin enforcement of the relevant statutes and regulations in all circumstances.  And plaintiffs

acknowledged as much at the TRO hearing and in the narrowed relief requested in their proposed order.[5]

Instead, the court issues a narrow ruling.  It enjoins defendants from imposing political committee reporting and disclosure requirements on plaintiffs based on any determination that express advocacy is *a* major purpose of Fresh Vision.  To impose these requirements, defendants must find—in accordance with *Buckley*—that Fresh Vision is a political committee either because it is "under the control of a candidate" or because "*the* major purpose" of Fresh Vision "is the nomination or election of a candidate."  424 U.S. at 79 (emphasis added).  Before outlining the TRO with specificity, the court turns to some TRO procedural considerations under Fed. R. Civ. P. 65:  requiring a bond and duration of the TRO.

## V.        Requiring a Bond

According to Fed. R. Civ. P. 65(c), a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Though this rule suggests a mandatory requirement, the Tenth Circuit has "held that a trial court has 'wide discretion' under Rule 65(c) in determining whether to require security."  *Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003).  "The Court may exercise its discretion, and determine a bond is unnecessary 'if there is an absence of proof showing a likelihood of harm.'"  *TMFS Holdings, LLC v. Capace*, No. 17-2063, 2017 WL 495983, at *6 (D. Kan. Feb. 7, 2017) (quoting *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987)).  Defendants have provided

---

[5]        At the TRO hearing, the court directed plaintiffs to submit a proposed order informally outlining the scope of relief they requested.  While the court didn't adopt the proposed order wholesale, it drew from plaintiffs' helpful suggestions on the scope of relief question.

no information about potential costs or damages in their brief or during the TRO hearing.  And, given that all defendants have been sued in their official capacity as members of a state commission, the court requires no security here.  *See Bella Health & Wellness v. Weiser*, 669 F. Supp. 3d 1125, 1130 (D. Colo. 2023) (requiring no security when defendants were sued in their official capacity as members of various state medical boards, as district attorneys, or as state attorney general).

## VI.      Duration

Fed. R. Civ. P. 65(b)(2) provides that a temporary restraining order issued without notice "expires at the time after entry—not to exceed 14 days—that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension."  Here, however, this Order issues with notice and after a TRO hearing. "When the opposing party has been notified and a hearing held prior to the issuance of a temporary restraining order, the specific requirements of Fed. R. Civ. P. 65(b), including the [14]-day limitation on the duration of such an order, do not apply."  *Kan. Hosp. Ass'n v. Whiteman*, 835 F. Supp. 1548, 1551 (D. Kan. 1993).  And so, this Restraining Order will remain in force pending a ruling on the portion of plaintiffs' motion seeking a preliminary injunction.

## VII.     Conclusion

Plaintiffs have established all three prongs of the TRO standard.  Plaintiffs are likely to succeed on the merits because Tenth Circuit precedent concludes that *Buckley*'s major purpose test applies to a state's regulation of political committees.  And under *Buckley*'s text, Kansas's statutory definition of a "political committee" is likely unconstitutionally overbroad.  Plaintiffs also have established the requisite irreparable injury by virtue of identifying a chilling effect to their First Amendment speech and association rights.  The final merged prong likewise tips in

plaintiffs' favor in light of the need to protect their constitutional rights. And so, the court grants plaintiffs narrowed relief, as ordered below.[6]

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiffs Fresh Vision, Overland Park, Inc., James G. Muir, and Chengny Thao's Motion for a Temporary Restraining Order and Preliminary Injunction (Doc. 2) is granted in part. The portion of the motion seeking a preliminary injunction remains pending.

**IT IS FURTHER ORDERED THAT** defendants and their officers, agents, servants, employees, and other persons acting in concert or participation with them[7] who receive actual notice of this Order by personal service or otherwise are temporarily restrained from enforcing Kan. Stat. Ann. §§ 25-4145, 25-4148 and Kan. Admin. Regs. § 19-21-3[8] against plaintiffs based

---

[6]    The separate document rule requires courts to enter a preliminary injunction separately because its appealability qualifies it as a judgment under Fed. R. Civ. P. 54(a). And "every judgment or amended judgment must be set out in a separate document[.]" Fed. R. Civ. P. 58(a). *See also MillerCoors LLC v. Anheuser-Busch Cos.*, 940 F.3d 922, 923 (7th Cir. 2019) (remanding for district court to enter preliminary injunction on separate document); *Beukema's Petrol. Co. v. Admiral Petrol. Co.*, 613 F.2d 626, 627 (6th Cir. 1979) ("[I]t appears to the court that the express provisions of Rule 58 for entry of judgment on a separate document applies not only to final judgments in the ordinary sense but also to preliminary injunctions entered pursuant to Rule 65[.]").

This Order does not enter a preliminary injunction. And, unlike a preliminary injunction, TROs aren't ordinarily appealable—with some narrow exceptions. *S. Wind Women's Ctr. LLC v. Stitt*, 808 F. App'x 677, 680 (10th Cir. 2020). But, because this TRO is of indefinite duration, the court will enter this TRO separately out of an abundance of caution.

[7]    Plaintiffs' proposed order applied this language—"officers, agents, servants, employees, and other persons"—to plaintiffs. *See* Fed. R. Civ. P. 65(d)(2). That is, plaintiffs proposed restraining defendants from acting against *plaintiffs*' officers, agents, etc. But the court here applies those words to defendants instead. By the court's reading, these words in Rule 65 define the persons bound by the order and so, they most logically apply to defendants—not plaintiffs. *Id.* What's more, to apply this language to plaintiffs impermissibly might expand the reach of this Restraining Order. Assume, for instance, that plaintiffs were to act in concert or participation with other organizations who the state properly designates as political committees. If this language applied to plaintiffs, it arguably could enjoin defendants from enforcing the statutes and regulation against a regulable entity and unnecessarily deprive Kansas of its legitimate informational interest in such regulation. The court thus declines to extend this Order's reach in the fashion plaintiffs proposed.

[8]    Plaintiffs' proposed order included three other statutes in their list of enjoined provisions: Kan. Stat. Ann. §§ 25-4152, 25-4167, and 25-4181. But plaintiffs' motion didn't ask the court to enjoin these

on a determination that Fresh Vision is a "political committee" because express advocacy is *a* major purpose of Fresh Vision under Kan. Stat. Ann § 25-4143(*l*)(1).  Instead, defendants may enforce the above enumerated statutes and regulation only based on a candidate-specific determination that express advocacy is *the* major purpose of Fresh Vision.

This Restraining Order will remain in force until the court rules on the propriety of a preliminary injunction, or otherwise vacates this Order.

**IT IS FURTHER ORDERED THAT** the combined hearing on the preliminary injunction and trial on the merits is set for 9:00 AM on September 17, 2024.

The court also adopts the schedule submitted by the parties in their proposed joint scheduling order and set forth in the table below.

| July 22, 2024 | Written Discovery Requests Due |
|---|---|
| August 2, 2024 | Responses to Written Discovery Requests Due |
| August 21, 2024 | Depositions Completed |
| August 23, 2024 | Stipulations of Fact Due |
| September 3, 2024 | Plaintiffs' Reply in Support of Preliminary Injunction Due |

**IT IS FURTHER ORDERED THAT** no security bond is required under Fed. R. Civ. P. 65(c).

**IT IS SO ORDERED.**

---

statutes.  *See generally* Doc. 2.  Nor did plaintiffs argue that the court should enjoin these statutes at the TRO hearing.  The court declines to include other statutes based on plaintiffs' proposed order alone— without argument or explanation.  The court doesn't mean to suggest it couldn't enjoin these statutes.  It acknowledges their relevance to plaintiffs' constitutional concerns as the statutes provide penalties for political committees who fail to file and for other violations of Kansas's Campaign Finance Act.  The court is willing to modify its Restraining Order to include these statutes if convinced by proper motion and argument.

Dated this 24th day of July, 2024, at Kansas City, Kansas.

s/ Daniel D. Crabtree
Daniel D. Crabtree
United States District Judge