IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

**FRESH VISION OP, INC., et al.,**

**Plaintiffs**,

**v.**

Case No. 24-4055-DDC-TJJ

**MARK SKOGLUND, Executive Director,**
**Kansas Governmental Ethics Commission,**
**et al.,**

**Defendants**.

## MEMORANDUM AND ORDER

This is a case about balance—the balance between a citizen's right to free speech and a state government's interest in campaign finance regulation. Plaintiffs Fresh Vision OP, Inc. and its officers—James G. Muir and Chengny Thao—contend provisions of the Kansas Campaign Finance Act (KCFA) violate their First Amendment rights to free speech. And so, plaintiffs filed a Complaint (Doc. 1), then a Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 2). Plaintiffs ask the court to enjoin defendants from enforcing those KCFA provisions (and their accompanying regulations). Defendants are officers and members of the Kansas Governmental Ethics Commission (KGEC)—the body responsible for enforcing Kansas's campaign finance laws.

Plaintiffs assert both as-applied and facial constitutional challenges to two provisions of the KCFA. *First*, plaintiffs challenge the way the KCFA defines a political committee. *Second*, plaintiffs contest certain KCFA reporting requirements, *i.e.*, those that apply when independent expenditures supporting express political advocacy surpass a given threshold. Earlier, at the

TRO stage, the court addressed plaintiffs' as-applied challenge to the first provision—KCFA's definition of a political committee—granting plaintiffs a Temporary Restraining Order (Doc. 23). That Order enjoined defendants "from enforcing Kan. Stat. Ann. §§ 25-4145, 25-4148 and Kan. Admin. Regs. § 19-21-3 against plaintiffs based on a determination that Fresh Vision is a 'political committee' because express advocacy is *a* major purpose of Fresh Vision under Kan. Stat. Ann § 25-4143(*l*)(1)." Doc. 23 at 1 (emphasis in original). Now, the court addresses plaintiffs' challenges at the PI stage—which the court, with the parties' concurrence, has consolidated with the trial on the merits. This Order thus finally adjudicates plaintiffs' as-applied and facial challenges to the KCFA. In doing so, it decides two things.

*First*, the court extends its Temporary Restraining Order and enjoins defendants permanently from designating Fresh Vision as a political committee when its express advocacy amounts merely to *a* major purpose—but not *the* major purpose—of the organization. To explain this extension, the court employs the same reasoning that produced the TRO ruling. *See* Doc. 22 at 6–12. The court doesn't expand the injunction, however, to grant plaintiffs' facial challenge to this same interpretation. Nor does the court grant the associated declaratory relief that a facial challenge could support. That's so because, as explained below, plaintiffs fail to satisfy the high standard applied to facial challenges. Plaintiffs never establish that the definition's unconstitutional applications substantially outweigh its constitutional ones. Having failed to make the showing required for a facial challenge to succeed, the court merely can grant as-applied relief.

*Second*, the court holds that plaintiffs lack standing to bring an as-applied or facial challenge to the KCFA's independent expenditure threshold, Kan. Stat. Ann. § 25-4150. The court reasons that plaintiffs have asserted a pre-enforcement challenge premised on chilled

speech.  But plaintiffs never demonstrate a credible threat of the kind of enforcement that plaintiffs envision—one that they assert chills their speech.  Concluding that plaintiffs thus fail to establish an injury in fact, the court dismisses plaintiffs' independent expenditure claim because they lack standing—meaning the court lacks subject matter jurisdiction over this second claim.

The court explains these rulings in more detail, below.

## I.    Factual Background

The court finds the following background facts from the parties' Stipulated Facts (Doc. 32), and the consolidated PI hearing and trial on the merits.

### Fresh Vision OP, Inc.

Fresh Vision is a non-profit organization dedicated to addressing issues of local concern in and around Overland Park, Kansas.  Doc. 32 at 1 (Stipulated Facts ¶ 1).  Fresh Vision, as an issue advocacy group, educates voters and advocates for quality of life and tax issues in Overland Park.  Doc. 40 at 7 (Hr'g Tr. 7:13–25).  Comprised of neighbors with diverse backgrounds—including farmers, business owners, and teachers—Fresh Vision seeks to protect the character of their neighborhoods.  *Id.* at 16 (Hr'g Tr. 16:1–7).  Fresh Vision recently has addressed issues such as the arboretum's proposed building of an amphitheater, a proposed mill levy increase, and a proposed farmer's market.  *Id.* at 16, 17, 18 (Hr'g Tr. 16:9–18, 17:8–14, 18:17–24).  Fresh Vision supports political candidates when they support Fresh Vision's goals. *Id.* at 7 (Hr'g Tr. 7:13–25).  Plaintiff James Muir serves as Fresh Vision's president and plaintiff Chengney Thao serves as its Secretary/Treasurer.  Doc. 32 at 1 (Stipulated Facts ¶ 2).

### Kansas Governmental Ethics Commission

The KGEC—comprised of nine commissioners—enforces the KCFA.  *Id.* (Stipulated Facts ¶ 3).  Plaintiffs sued the KGEC commissioners in their official capacities.  *Id.* (Stipulated Facts ¶ 5); Doc. 1 at  4–5 (Compl. ¶¶ 6–16).  Plaintiffs also sued defendant Mark Skoglund, who

has served as the KGEC's Executive Director since his appointment in 2017.  Doc. 32 at 1 (Stipulated Facts ¶ 4).  As Executive Director, Skoglund may investigate potential violations of the KCFA.  *See id.* at 2 (Stipulated Facts ¶ 8).  When he determines probable cause exists to believe the investigated party has violated the KCFA, he must file a complaint in his role as KGEC's Executive Director.  *Id.* (Stipulated Facts ¶ 10).  Private citizens also may submit complaints to the KGEC.  Doc. 40 at 33 (Hr'g Tr. 33:4–8).  When such a third party files a complaint, it may proceed with the complaint itself or, alternatively, may turn the complaint over to the Executive Director to pursue.  *Id.* at 37 (Hr'g Tr. 37:1–4).

After a complaint is filed, three steps follow:  (1) the commission reviews the complaint for sufficiency; (2) if it's sufficient, the commission reviews the complaint for probable cause; (3) if there's probable cause, the commission schedules a hearing.  *Id.* at 33–34 (Hr'g Tr. 33:25–34:15).  When the KGEC determines—based on these three steps—that an entity has violated the KCFA, it "shall" report its findings "to the attorney general and to the county or district attorney[.]"  Kan. Stat. Ann. § 25-4164; Doc. 32 at 2 (Stipulated Facts ¶ 11).  Alternatively, the Executive Director may resolve some complaints without engaging in all three steps but, instead, by issuing a letter of caution.  Doc. 40 at 40, 41 (Hr'g Tr. 40:21–23, 41:20–25).  Such letters allow the KGEC "to avoid . . . fines or enforcement actions"—which comports with their focus on "education and prevention."  *Id.* at 41 (Hr'g Tr. 41:3–9).

Skoglund used the three-step procedure to file complaints with the KGEC against plaintiffs Muir and Thao, as explained in more detail, next.  Doc. 32 at 2 (Stipulated Facts ¶ 12).

### *The Intersection of Fresh Vision and the KGEC*

In July 2021, Fresh Vision promoted a specific candidate (Dr. Faris Farassati) for mayor of Overland Park.  Doc. 1 at 11 (Compl. ¶ 44).  Fresh Vision endorsed Dr. Farassati via mailed materials and on its website.  *Id.*  After this endorsement, Skoglund filed complaints with the

4

KGEC against plaintiffs Muir and Thao, alleging that express advocacy was a major purpose of Fresh Vision.  Doc. 32 at 2 (Stipulated Facts ¶¶ 12–13).  Fresh Vision received a letter from defendants identifying it as a political committee because of its express advocacy.  Doc. 1 at 11 (Compl. ¶ 45); Doc. 1-1 at 2 (Pl. Ex. 1).  The letter notified plaintiffs of their failure to register as a political committee under Kan. Stat. Ann. § 25-4145 and failure to comply with the accompanying disclosure requirements.  Doc. 1-1 at 2 (Pl. Ex. 1).  And defendants' letter identified the civil and criminal penalties associated with intentional failure to file the required statement and fee.  *Id.*

Skoglund later voluntarily dismissed the complaints against plaintiffs.  Doc. 32 at 2 (Stipulated Facts ¶ 12).  Plaintiffs then allowed Fresh Vision to "go dormant."  *Id.* at 3 (Stipulated Facts ¶ 15).  That is, Fresh Vision's officers suspended its operations to avoid future regulation as a political committee.  Doc. 1 at 12 (Compl. ¶ 50).  Fresh Vision's membership dropped from six members to two after the KGEC investigation.  Doc. 40 at 21 (Hr'g Tr. 21:4–8).  Fresh Vision filed this action to challenge the constitutionality of the KCFA's political committee definition, Kan. Stat. Ann. § 25-4143(*l*)(1).  Doc. 1 at 2 (Compl.).  Thus, plaintiffs allege, the definition impermissibly burdens plaintiffs' freedoms of speech and association, violating 42 U.S.C. § 1983.  *Id.* at 13–14 (Compl. ¶¶ 59–63).

### *KGEC and the $100 Independent Expenditure Threshold*

Fresh Vision also challenges the constitutionality of the KCFA's independent expenditure threshold.  *See id.* at 3.  The KCFA provides statutory authority for the KGEC to regulate disclosure forms applying to independent expenditures.  Doc. 32 at 4 (Stipulated Facts ¶ 24); Kan. Stat. Ann. § 25-4158a.  Under Kansas law, independent expenditures are those made to a candidate (or other political entity) by a person other than a political committee (or other political entity) in an aggregate amount of $100 or more a year.  Doc. 32 at 3 (Stipulated Facts

¶ 23); Kan. Stat. Ann. § 25-4150.  Kansas law requires independent expendees to submit statements containing the information required by Kan. Stat. Ann. § 25-4148—*i.e.*, the reporting requirements for political committee disclosures.  Kan. Stat. Ann. § 25-4150.  But the KGEC provides a one-page form for reporting independent expenditures that—defendants argue— requires far less reporting, in practice, than political committee disclosures.  Doc. 32 at 4 (Stipulated Facts ¶¶ 25–26); Doc. 32-1 (Ex. A).  The KGEC has used similar independent expenditures reporting forms since at least 1992.  Doc. 32 at 5 (Stipulated Facts ¶ 32); Doc. 32-2 (Ex. B).  The commission can amend these forms at any time.  Doc. 40 at 63 (Hr'g Tr. 63:19– 22).

### *Fresh Vision, Going Forward*

Going forward, Fresh Vision intends to endorse candidates if it sees a candidate as "someone who would further [its] cause[,]" "protect the character of each neighborhood[,]" and "is forward thinking in terms of responsible development, [and] fiscal responsibility[.]"  *Id.* at 21 (Hr'g Tr. 21:9–23).  Fresh Vision also anticipates spending at least $100 to advocate for the election of an endorsed candidate, provided that it doesn't have to file disclosure reports like a political committee does when it spends more than $100.  *Id.* at 22–23 (Hr'g Tr. 22:23–23:5).

## II.     Procedural Background

On June 24, 2024, plaintiffs filed an Application for Temporary Restraining Order and Motion for Preliminary Injunction (Doc. 2).  Plaintiffs designated just one of its claims to support their Motion for the TRO stage—their as-applied challenge to Kansas's definition of a political committee under Kan. Stat. Ann. § 25-4143(*l*)(1).  Doc. 2 at 2.  In contrast, plaintiffs reserved their facial challenges to that same definition and to Kansas's $100 independent expenditure threshold for the preliminary injunction stage.  *Id.*; Doc. 34 at 1 n.1, 3.

On July 15, 2024, the court held a TRO hearing.  Doc. 21.  The court then issued a
Memorandum and Order granting the TRO portion of plaintiffs' motion (Doc. 2).  Doc. 22 at 1–
2.  The court also separately entered a Temporary Restraining Order, remaining in force until the
court's ruling on plaintiffs' request for a preliminary injunction or until the court otherwise
vacated the Order.  Doc. 23.  At the TRO hearing, all parties consented to the court consolidating
the preliminary injunction issue with the trial on the merits, as permitted by Fed. R. Civ. P.
65(a)(2).  So, the court consolidated these two procedural stages in its Scheduling Order.  Doc.
22 at 22.  Before the consolidated PI hearing and the trial, the parties filed joint stipulations of
facts, with attached exhibits, which the court treats as part of the evidentiary record for the trial
on the merits.  Doc. 32; Doc. 40 at 80–81 (Hr'g Tr. 80:15–81:9).  The court held the consolidated
hearing and trial on October 7, 2024, and continued it to December 20, 2024, for closing
argument.  Now that the parties have made their closing arguments, this Order finally adjudicates
all claims on their merits.

### III.    Plaintiffs' Requested Relief

Recall that plaintiffs ask for three things:  In Count I, they ask the court to hold that
Kansas's definition of a political committee (Kan. Stat. Ann. § 25-4143(*l*)(1))—and the operative
statutes enforcing that definition—are facially unconstitutional under the "the major purpose
test."  Doc. 34 at 1.  At bottom, they seek an order "preliminarily and permanently enjoining
Defendants . . . from enforcing" this statute.  Doc. 1 at 16 (Compl.).  In Count II, plaintiffs ask
the court to hold Kansas's $100 independent expenditure threshold facially invalid under either
Tenth Circuit precedent or the exacting scrutiny standard of review.  Doc. 34 at 3–7.  They
likewise request an order preliminarily and permanently enjoining defendants from enforcing the
threshold reporting requirements.  Doc. 1 at 16 (Compl.).  Finally, plaintiffs request declaratory
relief on both fronts.  They ask the court to declare both the political definition provision and the

independent threshold provision unconstitutionally void. *Id.* And they implore the court to declare that enforcing these provisions violates plaintiffs' First Amendment rights. *Id.*

One last note about plaintiffs' claims: plaintiffs emphasize that should either of their facial claims fail, they alternatively seek as-applied relief. *See* Doc. 34 at 1 n.1. The court's analysis begins with plaintiffs' first claim: their challenge to the KCFA's definition of political committee.

## IV.        KCFA's Definition of Political Committee (Count I)

### A.        As-Applied Unconstitutionality

In its earlier Order, the court held that plaintiffs were likely to succeed on their claim that Kansas's definition of a political committee is unconstitutional as-applied to Fresh Vision. Doc. 22 at 13. The court so concluded because Kansas's statutory definition allows the state to bestow political committee status on a group when express advocacy is no more than *a* major purpose of the group. *See* Kan. Stat. Ann. § 25-4143(*l*)(1) ("'Political committee' means any combination of two or more individuals or any person other than an individual, *a* major purpose of which is to expressly advocate[.]" (emphasis added)). But *Buckley v. Valeo* indicated that a political committee only may include entities "*the* major purpose of which is the nomination or election of a candidate." 424 U.S. 1, 79 (1976) (per curiam) (emphasis added). Plaintiffs contend that Kansas's definition sweeps too broadly because of this "a-versus-the" disparity, as applied in *Buckley*. *See* Doc. 2 at 2.

The Tenth Circuit has signaled that *Buckley*'s major purpose test applies to a *state's* regulation of political committees—the question at issue here. *See N.M. Youth Organized v. Herrera (NMYO)*, 611 F.3d 669, 677 (10th Cir. 2010) ("To be regulated under the standards established by the Supreme Court, the [New Mexico Campaign Reporting Act's] language would need to satisfy the 'major purpose' test, because this test sets the lower bounds for when

regulation as a political committee is constitutionally permissible."); *id.* at 679 ("[T]he Supreme Court's repeated admonition that only organizations that have 'the major purpose' of electing or defeating a candidate may be forced to register as political organizations."); *Colo. Right to Life Comm., Inc. v. Coffman (CRLC)*, 498 F.3d 1137, 1153 (10th Cir. 2007) (affirming district court holding that Colorado's political committee definition was unconstitutional as-applied because it failed to include *Buckley*'s "the" major purpose component).

Given *Buckley*, and given the Tenth Circuit's signals in its more recent cases, the court concludes again here that it must apply *Buckley*'s the major purpose test to evaluate whether Kansas appropriately designates an organization as a political committee under state law.[1]  And under that test, the KCFA's political committee definition is impermissibly broad because the statute uses the indefinite article, "a"—instead of the definite article, "the."  *See* Kan. Stat. Ann. § 25-4143(*l*)(1).  With Supreme Court and Tenth Circuit precedent in view, the court now extends its earlier "unconstitutional as-applied" ruling to the permanent injunction stage.  The court thus permanently enjoins defendants from imposing political committee reporting and disclosure requirements (or their attendant penalties) against plaintiffs based on a determination that express advocacy is merely *a* major purpose of Fresh Vision.  Instead, to impose these requirements or penalties, defendants first must find—in accordance with *Buckley*—that Fresh Vision is a political committee because "*the* major purpose" of Fresh Vision "is the nomination or election of a candidate" (or because Fresh Vision is "under the control of a candidate").[2]  *See Buckley*, 424 U.S. at 79 (emphasis added).

---

[1]    For a more complete discussion of *Buckely*'s major purpose test, Tenth Circuit precedent applying the test, and the corresponding unconstitutional as-applied decision in this case, *see* Doc. 22 at 6–12.

[2]    *Buckley* also holds that a political committee may include "organizations that are under the control of a candidate[.]"  424 U.S. at 79.  This variant of political committee isn't at issue here, however.

But this conclusion doesn't adjudicate all the relief plaintiffs seek.  Plaintiffs also seek "facial invalidation" of Kan. Stat. Ann. § 25-4143(*l*)(1).  Doc. 34 at 1.  Facial invalidity, though, is a much steeper hill for plaintiffs to climb.

### B.    Facial Unconstitutionality

A facial challenge is the "most difficult challenge to mount successfully[.]"  *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (internal quotation marks and citation omitted).  Typically, "a plaintiff cannot succeed on a facial challenge unless he establishes that no set of circumstances exists under which the law would be valid or he shows that the law lacks a plainly legitimate sweep."  *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024) (quotation cleaned up).  "In First Amendment cases, however, [the Supreme] Court has lowered that very high bar."  *Id.*  Instead, the question in the First Amendment context "is whether a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  *Id.* (quotation cleaned up).  This standard, though less demanding than applied in other contexts, is nonetheless "still rigorous[.]"  *Id.*

"The first step in the proper facial analysis is to assess the state laws' scope.  What activities, by what actors, do the laws prohibit or otherwise regulate?"  *Id.* at 2398.  "The next order of business is to decide which of the laws' applications violate the First Amendment, and to measure them against the rest."  *Id.*  "To justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep."  *United States v. Hansen*, 599 U.S. 762, 770 (2023).  That's so because "claims of facial invalidity often rest on speculation about the law's

---

Nothing suggests that a candidate controls Fresh Vision, or that KGEC has asserted that a candidate ever has done so.  Instead, the court includes the "candidate control" language here merely to clarify that— were Fresh Vision under the control of a candidate—*Buckley* might warrant a different analysis.

coverage and its future enforcement." *Moody*, 144 S. Ct. at 2397 (quotation cleaned up). After conducting this two-step analysis, a court may strike down "in its entirety" "even a law with 'a plainly legitimate sweep'" but "only if the law's unconstitutional applications substantially outweigh its constitutional ones." *Id.*

"Even in the First Amendment context, facial challenges are disfavored[.]" *Id.* at 2409. "[N]either parties nor courts can disregard the requisite inquiry into how a law works in all of its applications." *Id.* "In the absence of a lopsided ratio, courts must handle unconstitutional applications as they usually do—case-by-case." *Hansen*, 599 U.S. at 770.

Here, plaintiffs have failed to establish the lopsided ratio required for a facial challenge to succeed. Plaintiffs' burden required them to establish that Kansas's definition of a political committee imposes more unconstitutional applications than lawful ones. What follows is plaintiffs' effort to do so. They assert:

> Kansas's law could be applied to an organization with the major purpose of electing a candidate. But it could also be applied to a myriad of other organizations with innumerable major purposes unrelated to election activity when those groups tangentially support a candidate—like Fresh Vision. . . . Therefore, while the law has one lawful use, it has countless unconstitutional applications[.]

Doc. 34 at 2. This assertion, without more, doesn't demonstrate a substantially disproportionate number of unconstitutional applications. It falls short of the mark for two reasons.

*First*, plaintiffs' approach asks the court to compare apples to oranges. Plaintiffs suggest that Kansas could apply the law "to an organization with the major purpose of electing a candidate"—resulting in "one lawful use." *Id.* Plaintiffs thus conclude there's just one constitutional application of the provision. Then, plaintiffs contend that Kansas could apply the law "to a myriad of other organizations with innumerable major purposes." *Id.* Plaintiffs thus conclude that there are "countless unconstitutional applications[.]" As such, plaintiffs try to

11

identify the requisite lopsided ratio—a single constitutional application to countless unconstitutional ones. But plaintiffs apply their metric inconsistently.

In the first instance, plaintiffs want the court to lump together all "*the* major purpose" organizations and count them as a singular, amorphous constitutional application of the law. Then, immediately next, plaintiffs want the court to consider all "*a* major purpose" organizations individually and count each one as a discrete unconstitutional application of the law. But the court must weigh the constitutional and unconstitutional applications using a consistent metric. Plaintiffs can't have it both ways. That is, the court must weigh the law's applications either using apples (lumping together all organizations of a particular type as one application of the law) or oranges (evaluating each individual organization as a discrete application of the law). Plaintiffs' internally inconsistent argument fails to establish the requisite lopsided ratio for a facial challenge. But even if plaintiffs had settled on just using apples or just using oranges, their facial challenge still wouldn't clear *Moody*'s hurdle, as the court explains next.

*Second*, by either metric, plaintiff fails to carry their burden under *Moody*. Recall that *Moody* requires plaintiffs asserting a facial challenge to show that the "law's unconstitutional applications substantially outweigh its constitutional ones." 144 S. Ct. at 2397. Without addressing "the full range of activities the law[] cover[s] and measur[ing] the constitutional against the unconstitutional applications," a party's challenge is more like an as-applied challenge than a facial one. *Id.* at 2397–98. Whether measured by apples or by oranges, plaintiffs never marshal any proof of *Moody*'s required disproportionality.[3]

---

[3]     The Tenth Circuit hasn't applied *Moody* yet. But this court reads *Moody* to require a full-throttle analysis, evaluating all a law's potential applications in the context of a facial challenge. *See Moody*, 144 S. Ct. at 2409 ("[N]either parties nor courts can disregard the requisite inquiry into how a law works in all of its applications."). In *Moody*, the Court considered whether two state laws—one regulating social-media platforms and the other regulating websites—facially violated the First Amendment. 144 S. Ct. at 2393. The parties' arguments during the proceedings below had focused only on "curated feeds" and "the

Take the apples approach for starters.  Plaintiffs urge the court to lump together all groups of a particular type and count that cohort as one application of the law.  So let's try that.  Kansas may categorize just two types of groups as political committees under Kan. Stat. Ann. § 25-4143(*l*)(1)'s definition:  groups with *a* major purpose of express political advocacy and groups with *the* major purpose of express political advocacy.  The court already has concluded that Kansas law, by categorizing "*a* major purpose" groups as political committees is unconstitutional under *Buckley*.  Lumping all "*a* major purpose" groups together, that's one unconstitutional application.

Now, the flip side:  plaintiffs never contest that Kansas may categorize "*the* major purpose" groups constitutionally as political committees.  Indeed, plaintiffs appear to concede as much.  *See* Doc. 34 at 2 ("Kansas's law could be applied to an organization with the major

---

largest and most paradigmatic social-media platforms."  *Id.* at 2394.  But that's not sufficient for a proper facial analysis of the laws' scope, Justice Kagan explained.  *Id.* at 2398.  Instead, the parties should have assessed both the other services (beyond curated feeds) and also the other social-media entities (beyond "Facebook and the other giants") that the state laws might affect.  Without addressing "the full range of activities the laws cover and measur[ing] the constitutional against the unconstitutional applications[,]" the Court deemed these cases more like as-applied claims than facial ones. *Id.* at 2397–98.  A full analysis of the laws' applications required the parties to consider "an ever-growing number of apps, services, functionalities, and methods for communication and connection," each of which might have to change based on the state laws at issue.  *Id.* at 2398.  *Moody* held that the parties hadn't "briefed the critical issues," leaving the record "underdeveloped."  *Id.* at 2399.  Because the parties didn't address the laws' scope, no court could "do anything else with these facial challenges[.]"  *Id.* at 2398 (quotation cleaned up).  So, a viable facial challenge requires developed evidence and briefing analyzing all the law's potential applications.  Plaintiffs haven't hit that mark here.

This full-throttle approach also aligns with how other courts and scholars have interpreted *Moody*. *See, e.g.*, *NetChoice, L.L.C. v. Paxton*, 121 F.4th 494, 498 (5th Cir. 2024) (urging district court on remand to reject plaintiffs' limited focus on law's "heartland applications" because "the district court cannot truncate its evaluation" of all applications under *Moody*); *Free Speech Coal., Inc., v. Rokita*, No. 24-CV-00980-RLY-MG, 2024 WL 5055864, at *3 (S.D. Ind. July 25, 2024) (enumerating the wide range of websites and blogs—beyond plaintiffs' websites—the court considered and explaining that the court thus measured "almost all" of act's unconstitutional applications).  According to a recent Harvard Law Review article, *Moody*'s facial challenge analysis requires "conducting . . . a comprehensive and mathematical catalogue of the full range of a law's applications."  Evelyn Douek & Genevieve Lakier, *Lochner.com?*, 138 Harv. L. Rev. 100, 167 (2024).  The court agrees with this approach, concluding that *Moody* requires a robust showing of all of a law's applications.  Plaintiffs here haven't provided that kind of showing.

purpose of electing a candidate. . . . [T]he law has one lawful use[.]"). Lumping "*the* major purpose" groups together, that's one constitutional application. This scoreboard produces a tie—one-to-one. Groups with only *a* major purpose of express political advocacy fall on the unconstitutional side of the ledger, while groups with *the* major purpose fall on the constitutional side. One-to-one's not disproportionate. It's equal. Counting applications when lumping groups by type doesn't provide the lopsided ratio required for a valid facial challenge under *Moody*. So, apples don't get the job done. How about oranges?

Under the oranges' metric, the court tallies applications by counting each individual group that could receive a political committee designation under the Kansas definition. To uphold a facial challenge, the court would need to find that the list of unconstitutional applications is lopsidedly longer than the list of constitutional applications. That is, there'd need to be more groups who Kansas would categorize unconstitutionally as a political committee than groups it would categorize, constitutionally, as such. But plaintiffs here never try to furnish such a list. Plaintiffs never identify any individual groups that fall, constitutionally, under the political committee designation. And plaintiffs never identify a single "*a* major purpose" organization—other than Fresh Vision—who Kansas could categorize unconstitutionally as a political committee.

Instead, plaintiffs ask the court to speculate that other "*a* major purpose" organizations exist—and that they exist in substantially disproportionate numbers compared to the "*the* major purpose" organizations. *Id.* But the Supreme Court has rejected uses of such speculation. *See Moody*, 144 S. Ct. at 2397 ("For a host of good reasons, courts usually handle constitutional claims case by case, not en masse. Claims of facial invalidity often rest on speculation about the law's coverage and its future enforcement." (quotation cleaned up)); *see also Hansen*, 599 U.S.

at 786 (Thomas, J., concurring) (chiding circuit court for "speculating about imaginary cases and sifting through an endless stream of fanciful hypotheticals, from which it concluded that the statute may be unconstitutional as applied to other (hypothetical) individuals in other (hypothetical) situations" (quotation cleaned up)).  Plaintiffs' reliance on speculation leaves the record woefully "underdeveloped," just as it was in *Moody*.  And this underdeveloped characteristic precludes the court from "doing anything else with [plaintiffs'] facial challenge." *Moody*, 144 S. Ct. at 2398–99 (quotation cleaned up).

In sum, plaintiffs never shoulder their disproportionality burden, whether counted as apples or as oranges.  *See Computer & Commc'ns Indus. Ass'n v. Paxton*, No. 1:24-CV-849-RP, 2024 WL 4051786, at *13 (W.D. Tex. Aug. 30, 2024) (reiterating plaintiffs' burden and refusing to enjoin law's provisions where plaintiffs' briefing fails to identify law's unconstitutional applications and measure them against the rest).  Instead, they concede that constitutional applications of the challenged law reside alongside unconstitutional ones.  But they've provided the court with no means to weigh the law's constitutional scope against its unconstitutional scope.  So, the court concludes it must decide unconstitutional applications of Kan. Stat. Ann. § 25-4143(*l*)(1) on a case-by-case basis, *Hansen*, 599 U.S. at 770—just as the court does here.  The court thus denies plaintiffs' facial challenge to Kansas's definition of political committee and its attendant enforcement provisions.  Plaintiffs have failed to carry their burden to show the "lopsided ratio" required before holding a law unconstitutional on its face.  *Id.*  On to Count II.

## V.    KCFA's $100 Independent Expenditure Threshold (Count II)

Plaintiffs also ask the court to enjoin—for the first time at this stage of the case— enforcement of the KCFA's $100 independent expenditure threshold and associated regulations (Kan. Stat. Ann. § 25-4150; Kan. Admin. Reg. §§ 19-21-5, 19-29-2).  Doc. 1 at 16 (Compl.); Doc. 2 at 1.  The independent expenditure statute requires disclosures when a person *other than* a

15

political committee spends $100 or more to endorse a candidate or affiliated committee.  Here's
the pertinent statutory text:

> Every person, **other than a** candidate or a candidate committee, party committee
> or **political committee,** who makes contributions or expenditures, other than by
> contribution to a candidate or a candidate committee, party committee or political
> committee, in an aggregate amount of $100 or more within a calendar year **shall
> make statements containing the information required by K.S.A. 25-4148**[.]

Kan. Stat. Ann. § 25-4150 (emphasis added).

Plaintiffs contend this law is facially unconstitutional—as are its accompanying
regulations, Kan. Admin. Regs. §§ 19-21-5, 19-29-2.  That's so, plaintiffs argue, because the
statute and regulation automatically place an organization into the political committee
category—and require its attendant disclosures—after a $100 spend.  Doc. 2 at 8–11; Doc. 34 at
3–5.  And, plaintiffs argue, the Tenth Circuit already has decided that such treatment based on a
minimal expenditure isn't okay.  *See* Doc. 34 at 5 (first citing *CRLC*, 498 F.3d at 1154, then
citing *NMYO*, 611 F.3d at 679).  But defendants respond, asserting that the statute explicitly
differentiates political committees from independent expendees, so there's no automatic
placement in the political committee category.  Doc. 15 at 11–12.  Relatedly, defendants argue
that the Tenth Circuit cases cited by plaintiffs are distinguishable.  *Id.* at 12–13.  Plaintiffs also
present an alternative argument:  Even if defendants are right and the two Tenth Circuit
expenditure cases don't apply, the statute (and regulations) nevertheless fail the exacting scrutiny
analysis required for a disclosure regime.  Doc. 2 at 11–14; Doc. 34 at 6–7.  Before the court can
address either of plaintiffs' arguments, however, it must address plaintiffs' standing to make
them.

### A.    Standing to Challenge Kansas's $100 Independent Expenditure Threshold

Defendants argue that plaintiffs lack standing to challenge the $100 independent
expenditure threshold.  Doc. 37 at 4.  More specifically, defendants contend that plaintiffs can't

establish an injury in fact because the enforcement plaintiffs envision is "hypothetical and unprecedented." *Id.* at 6.

"'Article III standing is a jurisdictional issue[.]'" *Kerr v. Polis*, 20 F.4th 686, 692 (10th Cir. 2021) (quoting *Felix v. City of Bloomfield*, 841 F.3d 848, 854 (10th Cir. 2016)). A court thus must address the "threshold question of subject-matter jurisdiction" and satisfy itself that standing exists before commenting about the merits of a claim. *Id.* at 691–92. And standing must exist for each claim, individually. "The burden is on the plaintiff to establish Article III standing by showing (1) an 'injury in fact' that is 'concrete and particularized' and 'actual or imminent,' (2) that the injury is 'fairly traceable to the challenged action of the defendant,' and (3) that the injury is likely to be 'redressed by a favorable decision' of the court." *Peck v. McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). And a "'plaintiff must demonstrate standing for each claim he seeks to press' and 'for each form of relief' that is sought." *M. S. v. Premera Blue Cross*, 118 F.4th 1248, 1260 (10th Cir. 2024) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)). Here, only the injury in fact requirement is at issue. That's because one fairly may trace the alleged chilling effect to the statute and regulations that require reporting after an independent expenditure. And were the court to invalidate those requirements, that ruling would redress plaintiffs' alleged chilled speech injury. So, the court focuses its standing inquiry on the first prong of this three-part standard: whether plaintiffs have established an injury in fact sufficient to confer standing, below.

Plaintiffs never allege that defendants have subjected them to the independent expenditure reporting requirements. *See generally* Doc. 2; Doc. 34. So, defendants haven't imposed an existing, actual injury on plaintiffs. But "[p]laintiffs can occasionally secure judicial

17

review of a law before the government applies it" in the form of a pre-enforcement challenge. *Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1239 (10th Cir. 2023); *see also Peck*, 43 F.4th at 1129 (explaining that where enforcing authority neither issued a penalty nor threatened to charge a plaintiff under the relevant statutory section, plaintiff can bring a pre-enforcement suit). In the First Amendment context, courts assess standing "with some leniency, thereby facilitating pre-enforcement suits." *Chiles v. Salazar*, 116 F.4th 1178, 1195 (10th Cir. 2024) (quotation cleaned up). And so, a plaintiff bringing a pre-enforcement suit "can show standing by alleging . . . a credible threat of future prosecution plus an ongoing injury resulting from the statute's chilling effect on her desire to exercise her First Amendment rights." *Id.* (quotation cleaned up).

"A three-prong test determines whether a plaintiff's alleged chilling effect "amounts to a cognizable injury." *Wyo. Gun Owners*, 83 F.4th at 1239. The test used to assess the alleged chilling effect is commonly referred to as the *Walker* test. *Peck*, 43 F.4th at 1129 (explaining injury in fact chilling effect "test pronounced by [Tenth Circuit] in *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082 (10th Cir. 2006)"). "All three prongs of the *Walker* test center on the circumstances of the particular plaintiff before the court." *Rio Grande Found. v. City of Santa Fe, N.M.*, 7 F.4th 956, 959 (10th Cir. 2021). The court begins its analysis by identifying, in part 1, below, the *Walker* test's first two prongs and evaluating plaintiffs' injury in fact under those prongs. Part 2 then evaluates plaintiffs' injury in fact under *Walker*'s third prong.

### 1.    Chilling Effect as Cognizable Injury—the First Two Prongs

*First*, under the *Walker* test, a "plaintiff must present evidence that in the past he has engaged in the type of speech affected by the challenged government action." *Wyo. Gun Owners*, 83 F.4th at 1239 (quotation cleaned up). But this requirement applies a low bar. In fact, it's so low that past speech isn't necessary at all. *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1163 (10th Cir. 2023). Instead, "[p]ast relevant speech, where it exists, simply helps to

differentiate the plaintiff's specific, concrete alleged injury from the general, hypothetical interest of the public." *Id.* Here, plaintiffs' expenditures to endorse Dr. Farassati satisfy this prong. Doc. 1 at 11 (Compl. ¶ 44). Although plaintiffs haven't demonstrated that they filed an independent expenditure report because of these expenditures, endorsing a candidate financially is the type of speech affected by the independent expenditure threshold statute challenged here. Plaintiffs thus have established the requisite history of engagement in the pertinent form of speech.

*Walker's* second prong requires plaintiffs to "supply affidavits or testimony stating a present desire, though no specific plans, to engage in such speech." *Wyo. Gun Owners*, 83 F.4th at 1240 (quotation cleaned up). This prong "is not meant to be difficult to satisfy" and "affidavits stating a general desire suffice." *Id.* (quotation cleaned up). "A plaintiff need not show the specific content or likely timing of their desired speech." *Oliver*, 57 F.4th at 1164. "Nothing more concrete than [a] general aspiration is needed to meet the second prong." *City of Santa Fe*, 7 F.4th at 960. Here, plaintiffs' declarations testify that "Fresh Vision will contribute or spend an aggregate of $100 or more within a calendar year on express advocacy when that activity serves its purposes." Doc. 2-1 at 5 (Muir Decl. ¶ 25); Doc. 2-2 at 5 (Thao Decl. ¶ 25). And plaintiff Thao also testified at trial that she anticipates Fresh Vision will spend at least $100 to advocate for a candidate's election to office, provided that it doesn't have to file disclosure reports like a political committee to do so. Doc. 40 at 22–23 (Hr'g Tr. 22:23–23:5). These declarations and testimony suffice to satisfy the second prong. Now, the third prong.

### 2.    Credible Threat of Enforcement or Prosecution—the Third Prong

*Finally*, *Walker* requires "the plaintiff [to] make a plausible claim that he presently has no intention to [engage in such speech] because of a credible threat that the statute will be enforced." *Wyo. Gun Owners*, 83 F.4th at 1240 (quotation cleaned up). Defendants train their

standing arguments on this third prong—plaintiffs' burden to establish a credible threat of enforcement.

Plaintiffs assert that they won't exceed the $100 threshold to support a political candidate if such an expenditure requires them "to file disclosure reports like a political committee." Doc. 40 at 23 (Hr'g Tr. 23:3–5). The expenditure threshold statute thus chills their exercise of free speech, plaintiffs contend. And so, the court must decide whether plaintiffs have demonstrated a credible threat of political committee-like reporting requirements will follow from such an expenditure.

"The mere presence on the statute books of an unconstitutional statute, in the absence of enforcement or credible threat of enforcement, does not entitle anyone to sue[.]" *Winsness v. Yocom*, 433 F.3d 727, 732 (10th Cir. 2006). Instead, "to satisfy Article III, the plaintiff's expressive activities must be inhibited by an objectively justified fear of real consequences." *Id.* (quotation cleaned up). *Walker*'s third prong asks "not whether someone standing in the plaintiff's shoes would be deterred from speaking, but rather whether the plaintiff in question claims to be deterred and whether such deterrence is plausible." *City of Santa Fe*, 7 F.4th at 960. "Put another way, standing on a chilled-speech claim requires both subjective and objective deterrence—*i.e.*, not just that the plaintiff claims to be deterred by the challenged law but that the challenged law would plausibly deter a reasonable person in the plaintiff's position." *Oliver*, 57 F.4th at 1164.

To determine whether plaintiff has shown a credible fear of prosecution, our Circuit applies yet another three-factor test nestled—Russian-doll style—inside the *Walker* test's third prong. The three factors ask: "(1) whether the plaintiff showed past enforcement against the same conduct; (2) whether authority to initiate charges was not limited to a prosecutor or an

agency and, instead, any person could file a complaint against the plaintiffs; and (3) whether the state disavowed future enforcement." *Chiles*, 116 F.4th at 1198 (quotation cleaned up).

Here, plaintiffs declare, after KGEC's attempted enforcement action against them they decided "to suspend operations" "because of fear of further government interference with its mission and possible prosecution[.]" Doc. 2-1 at 4 (Muir Decl. ¶ 16); Doc. 2-2 at 4 (Thao Decl. ¶ 16). Plaintiffs thus have demonstrated a justified fear of real consequences when it comes to the KGEC categorizing Fresh Vision as a political committee. But that's Count I's claim. This standing determination rests on Count II's claim. Recall that plaintiffs must establish standing for each individual claim. *See M. S. v. Premera Blue Cross*, 118 F.4th at 1260. So, the court must determine whether plaintiffs assert that the independent expenditure statute and regulations deterred them from spending more than $100 on political advocacy. *City of Santa Fe*, 7 F.4th at 960. But that's only half of it. The court also must evaluate whether "the challenged law would plausibly deter a reasonable person in the plaintiff's position." *Oliver*, 57 F.4th at 1164. To do so, the court assesses, below, the three factors used to determine a credible fear of prosecution.

a.    **Past Enforcement Against the Same Conduct**

The first factor the Tenth Circuit has identified to assess a credible fear of prosecution is "whether the plaintiff showed past enforcement against the same conduct." *Chiles*, 116 F.4th at 1198 (quotation cleaned up). A "lack of any recorded instances of past prosecutions . . . weighs against" a finding of credible fear. *Peck*, 43 F.4th at 1132. Other circumstances, however, can counterbalance such a "dearth of prosecutions[.]" *Id.* (finding fact that Colorado Department of Human Services certified its enforcement of challenged statute annually to the federal government counterbalanced absence of past prosecutions).

Here, plaintiffs' chilled speech injury rests on their assertion that the independent expenditure statute requires reporting of the same magnitude as a political committee.  Doc. 34 at 3–4.  And plaintiffs point to the text of the statute itself as proof.  The relevant portion reads:

> Every person, other than a candidate or a candidate committee, party committee or political committee, who makes contributions or expenditures, other than by contribution to a candidate or a candidate committee, party committee or political committee, in an aggregate amount of $100 or more within a calendar year shall make statements containing the information required by K.S.A. 25-4148[.]

Kan. Stat. Ann. § 25-4150.  So, plaintiffs contend, the language of the statute allows Kansas to require the same level of disclosures for independent expendees as it does for political committees.  And that much disclosure chills their speech, plaintiffs assert.  Doc. 40 at 22–23 (Hr'g Tr. 22:23–23:5) ("Q. Will Fresh Vision spend that $100 to support that candidate if you have to file disclosure reports like a political committee?  A. No.") (testimony by Chengny Thao, Fresh Vision's Secretary/Treasurer).

Not so fast, defendants respond.  They argue that Kansas has never required an entity that isn't a political committee to file extensive disclosure reports.  Doc. 37 at 7.  And the parties stipulate to documentation demonstrating that—since 1992—independent expenditure disclosures require a simple one-page form.  Doc. 32 at 5 (Stipulated Facts ¶¶ 31–33); Doc. 32-1 (Ex. A); Doc. 32-2 (Ex. B); Doc. 32-3 (Ex. C).  Indeed, the parties stipulate that "the KGEC does not currently require [an independent expendee] to file the reports or provide the full breadth of information required of political committees[.]"  Doc. 32 at 4 (Stipulated Facts ¶ 25).  It would seem, then, that any past enforcement under the $100 independent expenditure threshold doesn't align with the extensive, political-committee-like enforcement plaintiffs claim to fear.

Undeterred, plaintiffs argue that the one-page form—in practice—requires even greater disclosures than those required for a political committee.  *See* Doc. 40 at 53–63 (Hr'g Tr. 53:12–

63:14) (comparing form required for independent expenditures, Doc. 32-1, with forms required for political committee disclosures, Doc. 32-7). For example, plaintiffs demonstrated at trial that the form for independent expenditure reporting didn't exempt contributions under $50, at least not explicitly. *Id.* at 57–60 (Hr'g Tr. 57:25–60:21); Doc. 32-1 at 1. Nor did the instructions accompanying the form clarify that $50 contributions could remain un-itemized. Doc. 40 at 57–60 (Hr'g Tr. 57:25–60:21); Doc. 32-1 at 2. By contrast, the political committee reporting form expressly exempts contributions below $50, allowing such contributions to be lumped together under "Unitemized Contributions" as shown, below. Doc. 40 at 57 (Hr'g Tr. 57:7–24).

**Complete if last page of Schedule A**

| | | |
|---|---|---|
| Total Itemized Receipts for Period | | |
| Total Unitemized Contributions ($50 or less) | | |
| Sale of Political Materials (Unitemized) | | |
| Total Contributions When Contributor Not Known | | |
| **TOTAL RECEIPTS THIS PERIOD (to line 2 of Summary)** | | $0.00 |

Doc. 32-7 at 2 (Ex. G) (red outline added by the court). Plaintiffs also suggested the same disparity arose between the two reporting requirements when reporting "small dollar expenditures" below $300. Doc. 40 at 61–62 (Hr'g Tr. 61:1–62:11). But the court remains unconvinced that this showing by plaintiffs demonstrates past enforcement of the type plaintiffs fear.

Let's say the court were to accept plaintiffs' argument that—when it comes to reporting contributions below $50—the required disclosures are more stringent for independent expendees. But still, the reporting requirements for the $100 threshold form remain far less involved than those required of political committees. *Compare* Doc. 32-1 (not requiring report of amount of cash on hand and only requiring report of loan receipt when exceeding expenditure threshold), *with* Doc. 32-7 at 1, 7 (requiring report of amount of cash on hand and loans payable/receivable

regardless of expenditures). What's more, the independent expenditure report is event-driven, meaning that an individual or entity must file a report only when it has engaged in a political advocacy expenditure totaling $100 or more. *See* Doc. 32-1 at 2 ("The completed form is to be filed . . . for the time period when independent expenditures reach an aggregate amount of $100 or more during the calendar year[.]"). But political committees "shall file a report" regardless of expenditures, even in a "calendar year when no election is held." Kan. Stat. Ann. § 25-4148(a). So, even if the court assumes—without deciding—that an independent expendee had to report contributions below $50, that doesn't equate to greater overall disclosures. The forms required for political committees, *see* Doc. 32-7, demonstrate disclosure obligations not included in the independent expendee one-page form, Doc. 32-1. And so, plaintiffs' attempt to show past enforcement of political-committee-like disclosures for independent expenditures with the currently used, single-page form (Doc. 32-1) doesn't cut it.

Plaintiffs offer one final desperation heave: Plaintiffs contend that the statutory language permits defendants to change course and require the full panoply of political-committee-like reporting requirements for independent expendees at any time. *See* Doc. 32 at 4 (Stipulated Facts ¶ 24) ("The KGEC is tasked with creating the disclosure forms for these (and other) reporting requirements."); Doc. 40 at 63 (Hr'g Tr. 63:20–22) ("Q. [T]he commission has the ability to amend these forms at any time, correct? A. They could."). So, their fear that defendants could require extensive disclosure violative of their First Amendment rights is objectively justifiable, plaintiffs suggest.

To be sure, the statutory language appears to require the same reporting requirements for both political committees and independent expendees. *Compare* Kan. Stat. Ann. § 25-4145(a) ("Each . . . political committee . . . shall appoint a chairperson and a treasurer.") *and* Kan. Stat.

24

Ann. § 25-4148(a) ("Every treasurer shall file a report prescribed by this section."), *with* Kan. Stat. Ann. § 25-4150 ("Every person, other than . . . a political committee, who makes contributions or expenditures . . . in an aggregate amount of $100 or more . . . shall make statements containing the information required by K.S.A. 25-4148[.]"). And defendants admit that they can alter the form at any time. *See* Doc. 40 at 63 (Hr'g Tr. 63:20–22). But this abstract potential for alteration doesn't equate to past enforcement, as this factor requires. Instead, it hypothesizes and speculates about future enforcement possibilities. But this part of the chilled speech injury in fact analysis focuses on past—not future—enforcement.

Finally, even if the court accepted plaintiffs' argument that defendants could require the full panoply of political-committee-like disclosures, plaintiffs still identify no history of prosecutions for violating the KCFA. *See id.* at 71–72 (Hr'g Tr. 71:20–72:1) ("Q. How often [has] there been a criminal referral to the district attorney or the attorney general regarding violation of the Campaign Finance Act? A. Never to my knowledge. . . . at least not in my tenure."). Instead, when a violation occurs, the KGEC "typically tr[ies] to walk it back to help resolve the issue rather than seeking enforcement or fines. [The KGEC has] always been an entity that has prioritized prevention and education unless the issue is intentional or severe." *Id.* at 77 (Hr'g Tr. 77:15–19). So, even if the court were to accept that defendants require the same magnitude of disclosures for both groups—which it doesn't—plaintiffs still haven't demonstrated past prosecutions. And there is nothing in the record to counterbalance this "dearth of prosecutions[.]" *Peck*, 43 F.4th at 1132. And so, this factor favors a finding of no "objectively justified fear of real consequences." *Winsness*, 433 F.3d at 732 (quotation cleaned up).

### b.    Authority to Initiate Charges

Now the second factor:  "whether authority to initiate charges was not limited to a prosecutor or an agency and, instead, any person could file a complaint against the plaintiffs." *Chiles*, 116 F.4th at 1198 (quotation cleaned up).  When "only prosecutors can bring charges" under a given statute, this factor weighs against a credible threat finding.  *Peck*, 43 F.4th at 1132. Under the Kansas act, any person can file a complaint with the KGEC alleging violations of the KCFA.  Kan. Stat. Ann. § 25-4160.  And when a third party does file a complaint, that party can either turn it over to the KGEC's Executive Director to prosecute or can follow it through independently.  Doc. 40 at 36–37 (Hr'g Tr. 36:20–37:4).  But that kind of complaint doesn't initiate charges.  Instead, the KCFA instills enforcement in the KGEC.  Kan. Stat. Ann. § 25-4119a(d).  And when the KGEC—after a hearing—determines that an entity has violated the KCFA, it "shall" report its findings "to the attorney general and to the county or district attorney[.]"  *Id.* § 25-4164.  So, while any member of the public can initiate a complaint, only the attorney general or the county or district attorney can initiate charges.  This factor thus also favors the conclusion that plaintiffs aren't justified objectively in fearing real consequences from enforcement of the independent expenditure threshold.

### c.    State Disavowal

Finally, the court reaches the third factor used to assess whether there is a credible fear of prosecution:  "whether the state disavowed future enforcement."  *Chiles*, 116 F.4th at 1198 (quoting *Peck*, 43 F.4th at 1132).  The Tenth Circuit has clarified that "an assurance of non-enforcement is not necessary to defeat standing."  *Peck*, 43 F.4th at 1133 (quotation cleaned up). All the same, "a refusal to provide such an assurance undercuts" any argument that plaintiffs' perceived threat isn't "objectively justifiable."  *Id.*

26

Here, the single-page independent expenditure reporting form has remained unaltered since at least 1992.  Doc. 32 at 5 (Stipulated Facts ¶¶ 31–33); Doc. 32-1 (Ex. A); Doc. 32-2 (Ex. B); Doc. 32-3 (Ex. C).  That's more than 30 years of "historical and consistent activity[.]"  Doc. 40 at 64 (Hr'g Tr. 64:2–7).  Such a long-standing approach suggests Kansas has disavowed enforcement of more strenuous disclosure requirements for independent expenditures.  *Cf. Smith v. Becerra*, 44 F.4th 1238, 1252 (10th Cir. 2022) (finding moot a challenge to agency action when—despite agency's ability to "rescind[] [the action] with relative ease"—agency's conduct over previous two years suggested change in tack "unlikely").

What's more, the statute itself suggests the legislature never intended the full weight of Kan. Stat. Ann. § 25-4148's requirements to fall on independent expendees.  To start, the legislature explicitly provided that a treasurer must prepare and file the relevant disclosure report.  *See* Kan. Stat. Ann § 25-4148 (titled in part "Reports required of treasurer"); *id.* § 25-4148(a) ("Every treasurer shall file a report prescribed by this section.").  And the statute specifically associates that treasurer with a political or party committee.  *Id.* § 25-4148(c) ("In addition . . . every treasurer for any political committee and party committee shall report[.]").  The KCFA's definition of a treasurer likewise connects that role with a political committee, or the like.[4]  *See id.* § 25-4143(p) ("'Treasurer' means a treasurer of a candidate or of a candidate committee, a party committee or a political committee appointed under the campaign finance act[.]").  Tellingly, Kansas law requires a political committee to appoint a treasurer.  *See id.* § 25-4145(a) ("Each party committee and each political committee which anticipates receiving

---

[4]    Kan. Stat. Ann. § 25-4143(p) also defines treasurer to mean "a treasurer of a combination of individuals or a person other than an individual which is subject to K.S.A. § 25-4172(a)(2), and amendments thereto."  But that portion of the definition isn't relevant here.  Kan. Stat. Ann. § 25-4172 describes the reports required for individuals not domiciled in Kansas who intend to make particular types of contributions.  All plaintiffs here are domiciled in Kansas.  *See* Doc. 1 at 3–4.

contributions or making expenditures shall appoint a chairperson and a treasurer.")  But the KCFA never refers to treasurers when discussing independent expenditures.  *See id.* § 25-4150. It seems likely, then, that the legislature intended the KGEC to borrow the reporting requirements incumbent on political committees for independent expendees—but not whole hog. The KCFA doesn't require independent expendees to have a treasurer, and yet it directed Kan. Stat. Ann. § 25-4148 primarily at treasurers.  And it required independent expendees to "make statements," *id.* § 25-4150, not "file a report," as political committees must, *id.* § 25-4148(a). Indeed, the statute specifically aimed at independent expenditures explicitly distinguishes those expendees from a political committee.  *See id.* § 25-4150 ("Every person, *other than* a candidate or a candidate committee, party committee or political committee[.]" (emphasis added)).

So, there's a long, unaltered history of single-page form enforcement.  And there's the various ways the KCFA appears to distinguish between the reporting requirements incumbent on political committees from those incumbent on independent expendees.  The history and the statute together thus suggest state disavowal—at least disavowal of plaintiffs' envisioned enforcement, where independent expendees must report just as political committees do.  The third factor thus tips against a credible threat of enforcement, as well.

### d.    Credible Threat and Conclusion about Standing

Plaintiffs have failed to demonstrate an "objectively justified fear" of the sort of consequences they assert chills their speech.  *Winsness*, 433 F.3d at 732 (quotation cleaned up). Plaintiffs testified that they would refuse to exceed the $100 threshold specifically if they "have to file disclosure reports like a political committee."  Doc. 40 at 23 (Hr'g Tr. 23:2–5).  But plaintiffs' feared consequences—reporting requirements on par with those of a political committee—invoke a form of enforcement that is no better than hypothetical and speculative. Defendants never have enforced the $100 independent expenditure threshold to require the full

panoply of reports applied to a political committee.  And the absence of past enforcement (at the magnitude plaintiffs envision) undermines plaintiffs' fear of real consequences.  What's more, though any citizen can lodge a complaint, only specified officials can initiate charges.  This factor, too, tips against a credible threat finding.  Finally, the long history of unaltered, uniform enforcement of a simple, single-page form—coupled with the distinctions between political committee reports by treasurers and statements by independent expendees—bolsters the court's conclusion.

In sum, plaintiffs satisfy the first two prongs of the *Walker* test to establish chilled-speech standing.  But they fail to establish the third prong—credible threat of enforcement.  And the third prong most closely illuminates the "fundamental inquiry" used to determine pre-enforcement standing, namely:  whether the "chilling effect . . . arise[s] from an objectively justified fear of real consequences[.]"  *Wyo. Gun Owners*, 83 F.4th at 1240.  Without an affirmative answer to that "core question," plaintiffs can't demonstrate the requisite injury.  *Id.*  And, while "the rules for standing are less stringent for a facial challenge to a statute, a plaintiff must still satisfy the injury-in-fact requirement."  *City of Santa Fe*, 7 F.4th at 961 (internal quotation marks and citation omitted) (holding plaintiff lacked standing to lodge both as-applied and facial challenges when plaintiff undoubtedly met *Walker*'s first two prongs but didn't satisfy third prong).  The KCFA's independent expenditure threshold doesn't deter plausibly a reasonable person in plaintiffs' position because the consequences plaintiffs fear don't follow from the statute's enforcement history or the statutory scheme.  *See Oliver*, 57 F.4th at 1164 (holding that standing on a chilled speech claim requires "that the challenged law would plausibly deter a reasonable person in the plaintiff's position" and finding standing where "there was an objective risk the law would affect [plaintiff's] ability to engage in desired speech").  In

short, plaintiffs fail to establish an injury in fact and, thereby, they lack standing to assert a pre-enforcement challenge to the independent expenditure threshold. Without jurisdiction, the court must dismiss plaintiffs' as-applied and facial challenges to KCFA's independent expenditure threshold.

## VI.        Attorney Fees

Finally, plaintiffs' Complaint invokes 42 U.S.C. § 1988 seeking to request costs and attorneys' fees. Doc. 1 at 16 (Compl.). Section 1988 awards reasonable fees to a prevailing party in a federal civil rights action. Under 42 U.S.C. § 1988(b), a plaintiff prevails "'when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.'" *Verlo v. City & Cnty. of Denver*, 789 F. App'x 709, 712 (10th Cir. 2019) (quoting *Farrar v. Hobby*, 506 U.S. 103, 111–12 (1992)). That is, a "'plaintiff who succeeded on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit is a prevailing party.'" *Wyo. Gun Owners*, 83 F.4th at 1250 (quoting *Jane L. v. Bangerter*, 61 F.3d 1505, 1509 (10th Cir. 1995)).

Here, the court has granted plaintiffs' relief on their as-applied challenge to Kansas's definition of a political committee. Plaintiffs thus succeeded, in part, on one of the two claims asserted in their Complaint. And so, they acquired some of the benefit they sought in their suit. This ruling modifies defendants' behavior by preventing defendants from designating Fresh Vision as a political committee when express advocacy merely qualifies as a major purpose of Fresh Vision. Plaintiffs thus qualify as a prevailing party. The court leaves it to plaintiffs to comply with our local rule, D. Kan. Rule 54.2, to recover their fees.

VII.        Conclusion

The Supreme Court decision in *Buckley*, coupled with Tenth Circuit holdings in *NMYO*

and *CRLC*, require that a group have *the* major purpose—not simply *a* major purpose—of

express advocacy before a state may designate the group as a political committee.[5]  But KCFA's

definition of a political committee impermissibly allows Kansas to designate Fresh Vision (a

group with *a* major purpose of express advocacy but no more than that) as a political committee.

Therefore, the court finds for plaintiffs on part of their claim in Count I.  The court thus

permanently enjoins defendants from designating Fresh Vision as a political committee based on

a finding that express advocacy is *a* major purpose—but not *the* major purpose—of its

organization under Kan. Stat. Ann. § 25-4143(*l*)(1).  The court denies, however, plaintiffs' facial

challenge to this statutory provision.  Plaintiffs failed to shoulder their burden to establish a

substantially disproportionate number of unconstitutional applications.  And so, the court

declines to grant the declaratory relief plaintiffs requested on their facial challenge to their major

purpose claim.

Separately, the court dismisses in Count II as-applied and facial constitutional challenges

to KCFA's independent expenditure provision, Kan. Stat. Ann. § 25-4150.  Plaintiffs lack

standing to bring these pre-enforcement challenges and that absence deprives the court of subject

matter jurisdiction over those claims.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiffs Fresh Vision

OP, Inc., James Muir, and Chengny Thao's Motion for Temporary Restraining Order and

Preliminary Injunction (Doc. 2) is granted in part and denied in part.  Those same plaintiffs also

---

[5]        Again, *Buckley* also permits a political committee to include "organizations that are under the control of a candidate[.]"  424 U.S. at 79.  But this variant of political committee isn't at issue in this case.

prevail, in part, at trial on the merits of their claim in Count I.  The court thus issues a permanent injunction, as set forth below.  The court finds for defendants on plaintiffs' facial challenge in Count I.  So it denies the other forms of requested relief sought by Count I.  On Count II's as-applied and facial challenges to the independent expenditure threshold, the court concludes it lacks subject matter jurisdiction over these challenges.  Plaintiffs lack standing to assert either claim, so the court dismisses Count II.

**IT IS FURTHER ORDERED THAT** the court issues the following **PERMANENT INJUNCTION:**  Defendants and their officers, agents, servants, employees, and other persons acting in concert or participation with them who receive actual notice of this Injunction by personal service or otherwise are permanently enjoined from designating plaintiffs as a "political committee" under Kan. Stat. Ann § 25-4143(*l*)(1) based on a determination that express advocacy is *a* major purpose of Fresh Vision.  Instead, defendants may designate plaintiffs as a "political committee" under Kan. Stat. Ann § 25-4143(*l*)(1) based only on a determination that express advocacy is *the* major purpose of Fresh Vision.[6]

All parties shall be subject to the jurisdiction of this court as necessary to enforce the Permanent Injunction

---

[6]    Plaintiffs' motion also asks the court to enjoin the enforcement statutes and regulations that apply to political committees (Kan. Stat. Ann. §§ 25-4145, 25-4148, and Kan. Admin. Regs. § 19-21-3). *See* Doc. 2 at 1; Doc. 34 at 3.  And, plaintiffs contend, the injunction should extend to the penalty provisions for political committees, as well (Kan. Stat. Ann. §§ 25-4152, 25-4167, and 25-4181).  Doc. 34 at 3.  But, in the court's view, this requested relief follows from the court's injunction.  Defendants can't apply political committee statutes and regulations against Fresh Vision unless defendants designate Fresh Vision as a political committee.  This injunction ensures that defendants may designate Fresh Vision as a political committee only if constitutionally appropriate.  Moreover, plaintiffs never have argued that these statutes and regulations offend when applied to a group constitutionally categorized as a political committee.  So, the court enjoins the sole offending statutory provision—the definition of a political committee.

**IT IS FURTHER ORDERED THAT** the Clerk of the Court is directed to issue a judgment consistent with this Order.

**IT IS SO ORDERED.**

**Dated this 3rd day of January, 2025, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**